**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

|  |  |
|---|---|
| In re: | **FOR PUBLICATION** |
| B.C.I. FINANCES PTY LIMITED (In Liquidation), *et al.*, | Chapter 15 |
|  | Case No. 17-11266 (SAB) |
| Debtor in Foreign Proceedings.[1] | (Jointly Administered) |

----------------------------------------------------------X

## MEMORANDUM OPINION AND ORDER GRANTING THE MOTION TO COMPEL AND DENYING THE MOTION FOR A PROTECTIVE ORDER

**HONORABLE SHIREEN A. BARDAY**
**UNITED STATES BANKRUPTCY JUDGE**

This Chapter 15 matter began almost a decade ago when the first foreign proceedings relating the case were recognized and the Foreign Representative began to seek asset-tracing discovery from three members of the Binetter family: Andrew Binetter, his wife (Samantha Kelliher), and his brother (Michael Binetter)—collectively, the "Binetters." The Binetter brothers had been part of a tax fraud scheme that gave rise to substantial civil liability in Australia; in 2016, based on this conduct, an Australian court issued a civil assessment of AU$100 million. Detailed information about the Australian tax fraud scheme has been publicly available in the United States since at least May 9, 2017, when the Foreign Representative filed a copy of the decision from the Federal Court of Australia on the docket in this Chapter 15 proceeding. But at no time—before or after May 9, 2017—has anyone ever identified any nexus between the civil tax fraud in Australia and criminality in the

---

[1] The Foreign Debtors in the underlying Chapter 15 cases are the following eleven entities (the last four digits of their respective corporation identification numbers follow in parentheses): (i) B.C.I. Finances Pty Limited (8531); (ii) Binqld Finances Pty Limited (3220); (iii) E.G.L. Development (Canberra) Pty Limited (7646); (iv) Ligon 268 Pty Limited (4081) (collectively, (i)–(iv), the "Prior Foreign Debtors"); (v) Gerobin Finances Pty Ltd (6410); (vi) Erbin Finances Pty Ltd (9800); (vii) Rawbin Finances Pty Ltd (6549); (viii) Marbin Finances Pty Ltd (2970); (ix) Erma Nominees Pty Ltd (7040); (x) Ligon 158 Pty Ltd (4015); and (xi) ACN 078 881 035 Pty Limited (collectively, (v)–(xi) (1035), the "New Foreign Debtors," and, together with the Prior Foreign Debtors, the "Foreign Debtors").

1

United States.  Nevertheless, the Binetters have repeatedly sought to assert a Fifth Amendment "act of production" privilege to avoid complying with subpoenas in the United States and to frustrate the Foreign Representative's ability to obtain discovery from third-parties, including a corporate entity affiliated with the family (Nate's Fine Foods LLC) and JPMorgan Chase Bank, N.A. ("JPMorgan").

On February 26, 2026, six days after this matter was transferred to this Court, the issues relating to Nate's Fine Foods LLC ("Nate's Fine Foods") were resolved by transcript ruling, wherein, relevant here, the Court concluded that the Binetters had improperly attempted to invoke the Fifth Amendment on behalf of a corporate entity though the law clearly prohibited such; therefore, Nate's Fine Foods was ordered to comply with the subpoena it had received.  Adv. No. 26-01004, ECF No. 8 (Transcript of Hearing), ECF No. 9 (Order).  This Court now addresses the two remaining issues of Fifth Amendment privilege: first, whether the Fifth Amendment "act of production" privilege may be properly invoked by one of the Binetter brothers (Michael Binetter) to apply selective redactions to the content of bank statements that he does not intend to withhold from production entirely but, in fact, has already voluntarily produced (albeit with specific transactions redacted); and second, whether Michael Binetter may invoke a Fifth Amendment privilege to prevent JPMorgan from complying with a subpoena served on the bank by the Foreign Representative insofar as it seeks fully unredacted copies of Michael Binetter's bank statements known to exist as a result of the documents produced by Michael Binetter.  As set forth more fully below, because the Binetters's proposed application of the Fifth Amendment "act of production" privilege cannot be reconciled with the doctrine's scope, history, or fundamental purpose, the Binetters's Motion for a Protective Order is **DENIED** and the Foreign Representative's Motion to Compel is **GRANTED**.

2

**FACTUAL BACKGROUND**[2]

The story of the Binetters in Australia begins in 1950, when Erwin and Emil Binetter first arrived there. The two brothers went on to found and operate several businesses in Australia, including the "nudie" juice empire. Nudie juice, which they founded in 2003, became very successful; by some accounts, nudie juice produced over a million juices per month and therefore was one of the most prominent juice brands on supermarket shelves in Australia. Andrew Binetter became nudie's Chief Operating Officer in October 2004 and was quickly promoted to be Chief Executive Officer. ECF No. 2. In 2014, nudie juice was sold for roughly $80 million.

In 2006, the Australian Tax Office began an extensive audit that would last about three years, and culminated in the Australian Tax Office's conclusion that a complex group of businesses affiliated with the Binetters, including nudie juice, had been engaged in a twenty-plus-year tax evasion scheme, under which the Binetter entities entered into purported lending arrangements with banks outside of Australia to report nonexistent interest expense on their Australian tax returns in a fraudulent attempt to reduce their Australian tax obligations. The Commissioner of Taxation's audit resulted in findings of fraud or evasion, which enabled it to issue revised assessments dating as far back as 1992, in the case of one of the foreign debtors: E.G.L. Development (Canberra) Pty Limited (7646). All told, four of the Binetters's businesses, which were foreign debtors in the original Chapter 15 proceeding in this Court (the "Prior Foreign Debtors"), were hit with the AU$100 million tax assessment for their role in the fraud. These and

---

[2] A brief recitation of the facts drawn from the two prior decisions in this matter is included here for context only; the Court's adjudication of the motions before it is limited to the issues identified, and evidence submitted, by the parties in connection with those motions. The first decision, *In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288 (Bankr. S.D.N.Y. 2018) granted the Prior Foreign Debtors' petition for chapter 15 recognition. The second decision, *Matter of B.C.I. Finances Pty Ltd. (in Liquidation)*, 668 B.R. 51 (Bankr. S.D.N.Y. 2025), was issued after the New Foreign Debtors became subject to these jointly administered proceedings and therefore addressed all Foreign Debtors.

3

the other findings were documented in some detail in a decision from the Federal Court of Australia on November 18, 2016. *See* ECF No. 2 (the "2016 Australia Court Decision").[3]

The Foreign Representative in this proceeding was then appointed as the liquidator of the Prior Foreign Debtors and succeeded in obtaining an Australian civil judgment covering the AU$100 million tax assessment and then some, based on breaches of statutory and fiduciary duties. Despite the extensive findings as to the Binetters's tax evasion scheme, lengthy judicial proceedings in Australia, substantial related press coverage and the very sizeable civil judgment that resulted, no Binetter or any of their many companies appears to have ever been criminally prosecuted in Australia, let alone convicted of any crime, and no party has ever identified any prior or current criminal investigation of the Binetters or any of their businesses in Australia. Or anywhere else in the world.

The brothers (Michael and Andrew Binetter) moved to the United States in or around 2017. Shortly thereafter, the Foreign Representative commenced this proceeding on May 9, 2017, to obtain recognition of the Australian liquidation proceedings so that he could conduct an asset-tracing exercise in the United States.

### PROCEDURAL HISTORY OF THE UNITED STATES CASES

This case in bankruptcy court began on May 9, 2017, before the Honorable Sean H. Lane, when the Foreign Representative filed a chapter 15 petition for recognition of a foreign proceeding in Australia. ECF No. 1 (Petition). Recognition was contested—but granted—on April 24, 2018: *In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288, 303 (Bankr. S.D.N.Y. 2018) ("BCI I"). Less than a

---

[3] ECF numbers refer to documents filed in the main proceeding (Case No. 17-11266), which is the matter in which this Memorandum Opinion is being issued. Where docketed documents from other proceedings, including adversary proceedings, are referenced, the citation includes a reference to the specific proceeding number. As many of the documents preceding this Memorandum Opinion were filed under seal, this Court has provided a descriptive parenthetical to assist the reader in understanding the document's relevance.

year later, the matter was resolved and ordered closed. *See* ECF No. 70.[4] But almost as soon as

the case was closed, there was a new finding by the Australian Tax Office in 2020 that two new

Binetter entities—Erbin Finances Pty Ltd (9800) and Rawbin Finances Pty Ltd (collectively, the

"New Foreign Debtors")—had participated in a separate yet similar tax evasion scheme, leading

to the appointment of liquidators in those and other related entities in Australia. *Matter of B.C.I.*

*Finances Pty Ltd. (in Liquidation)*, 668 B.R. 51, 55 (Bankr. S.D.N.Y. 2025) ("BCI II").

Accordingly, the Foreign Representative, now representing the estates of the New Foreign Debtors

as well as the Prior Foreign Debtors, commenced a chapter 15 proceeding on behalf of the New

Foreign Debtors and moved to reopen the chapter 15 case on behalf of the Prior Foreign Debtors.

ECF No. 71 (Motion to Reopen). The Honorable Sean H. Lane granted recognition of the

liquidation proceedings of the New Foreign Debtors, over objections, and the matter was reopened

on December 1, 2021. *See* ECF Nos. 82, 84, 89.

    **The Asset-Tracing Exercise**

    In connection with the new matter, the Foreign Representative filed a motion seeking

authorization to pursue discovery to trace the Binetters's assets using the extraordinary authority

---

[4] The Foreign Representative had sought to trace assets in the United States and to investigate potential claims connected to the Australian tax evasion scheme. *BCI I*, 583 B.R. at 291. To carry out that goal, on June 20, 2018, the Foreign Representative filed a motion seeking authority to conduct examinations and serve subpoenas pursuant to 11 U.S.C. §§ 105(a) and 1521(a) and Fed. R. Bankr. P. 2004. ECF No. 45 (Application for 2004 Examination). On July 12, 2018, the court granted the motion. ECF No. 53 (Order Authorizing Service of Subpoenas). In October 2018, the Foreign Representative and the Binetters ultimately entered into a global settlement, resulting in an order closing the Prior Foreign Debtors' chapter 15 case. *See* ECF No. 70 (Order Closing Case).

conferred under Bankruptcy Rule 2004.[5] On May 16, 2022, the Foreign Representative's motion was granted, and he was given authority by the Court to pursue the Rule 2004 discovery he sought from the Binetters in connection with his asset-tracing exercise. *See* ECF No. 95 (the "Rule 2004 Order"). Among other things, pursuant to this authority, the Foreign Representative sought broad categories of discovery, including documents and communications relating to the Foreign Debtors, any bank account opened in the United States since 2015, any purchase of real property, any purchase of an asset with a value greater than $10,000 since 2015, any direct or indirect interest in certain entities, including but not limited to Nate's Fine Foods, and copies of United States tax returns for certain periods. *See* ECF No. 127, Exs. A, B, C (the "November 16 Subpoenas").

**Rule 2004 Enforcement**

Not long after the Rule 2004 Order issued in May 2022, this matter was transferred to the Honorable Philip J. Bentley. *See* ECF No. 96 (Notice of Reassignment on September 12, 2022). Thereafter, the Honorable Philip J. Bentley was confronted with a variety of disputes relating to the Rule 2004 Order, including those arising from the Binetters's position that none of them were required to ***produce any documents or provide any testimony at all*** in response to the Rule 2004 Order and November 16 Subpoenas. *See, e.g.*, ECF No. 135 (Objection to Motion to Enforce the Rule 2004 Order). In support of their position, the Binetters cited, among other things, their Fifth Amendment right against self-incrimination, which they argued entitled them to withhold copies of their bank statements and copies of certain documents filed with courts in Australia (the

---

[5] Rule 2004's wide latitude has been succinctly described as "very broad," "unfettered," and, most famously, akin to a "fishing expedition." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) ("very broad"); *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("unfettered"); *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("fishing expedition"). This breadth applies both to the subject-matter of interrogation and the identity of parties who may be compelled to provide discovery: "Because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation." *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

"Australian Court Documents").[6]   After extensive briefing and a lengthy oral argument, three orders were issued over objections on March 10, 2025:

(i)     an order granting the Foreign Representative's Motion to Enforce the 2004 Order (ECF No. 169, the "Rule 2004 Production Order"), which was accompanied by a "Modified Bench Ruling" (ECF No. 168);

(ii)    an "Order Regarding Fifth Amendment Privilege Production" (ECF No. 170, the "Procedures Order"); and

(iii)   a protective order, which provided for the tailored confidentiality of the Binetters's responses to the subpoenas issued by the Foreign Representative (ECF No. 171, the "Protective Order").

Together, these orders operated to create a two-track system to facilitate the Binetters's compliance with the Rule 2004 Order: "Track 1" required the Binetters to comply with the subpoenas served on them except as to anything they might assert was shielded from production pursuant to their Fifth Amendment rights.   For those documents, "Track 2" (the Procedures Order) was the mechanism to raise such issues.

**Track 1: Subpoena Compliance and Document Production**

On April 9, 2025, the day the Binetters's obligations to comply and produce documents came due under Track 1, the Binetters moved for an extension of time to respond to discovery

---

[6] The "Australian Court Documents" consist of a series of documents submitted to the Australian courts, which fall into four loose categories: (i) an April 10 Australian affidavit, (ii) Australian asset statements, (iii) transcripts of Australian proceedings, and (iv) other affidavits submitted to courts separate and apart from the affidavit dated April 10.  This Court has not reviewed any of these documents and so relies on the description of the categories of these documents from the Binetters's submission.  The Binetters describe each of those categories of documents as follows: the April 10 Australian affidavit is "an affidavit submitted by a third party in the Australian tax litigation, dated April 10, 2016, submitted to an Australian court.  The affiant asserts claims of theft, fraud, and using false identities in connection with financial transactions and loans involving the Binetter Parties" (the "April 10 Australian Affidavit"); the Australian asset statements are "statements of assets of the various entities referenced in the underlying subpoenas, from the Australian proceedings. [] These documents identify possible assets of Michael Binetter, the Binetters , and/or the entities that are the subject of the Subpoena and Order, with a date range of 2015–2020" (the "Australian Asset Statements"); the Australian transcripts are the "transcripts from Australian proceedings that allege impropriety of the Binetter Parties, including Michael, and/or identify alleged transfers of funds or identification of assets" (the "Australian Transcripts"); and the other Australian affidavits are those "affidavits from the Australian proceedings in which similar allegations of financial impropriety are made" (the "Other Australian Affidavits," together with the April 10 Australian Affidavit, the Australian Asset Statements, the Australian Transcripts, the "Australian Court Documents").  *See* Mot. for a Protective Order at 22-24.

obligations.  ECF No. 178 (Motion to Extend Time).  The parties were subsequently able to reach two separate consensual agreements: the first extending the time for Andrew Binetter and Samantha Kelliher to comply, due to certain health issues, and the second for Michael Binetter to comply.  The Court so-ordered each stipulation accordingly.  *See* ECF Nos. 188 (Michael Binetter extension), 189 (Andrew Binetter and Samantha Kelliher extension).

On April 28, 2025, Michael Binetter produced a number of documents pursuant to the Rule 2004 Production Order.  *See* ECF No. 239 ("Kopp Decl.") ¶ 4.  Among those documents were ***hundreds of pages*** of copies of Michael Binetter's bank statements for accounts held at JPMorgan. *Id*. ¶¶ 4-5.  While certain identifying information in those bank statements was unredacted, including the name of the account holder and JPMorgan's name as the holding bank, certain specific transactions were redacted.  *Id*., Ex B (Representative Sample of Michael Binetter's Produced Bank Statements).  The cover letter explained that the documents were being produced pursuant to Track 1; that is, "[p]ursuant to the Order Granting Foreign Representative's Motion to Enforce the Rule 2004 Order to Compel the Binetters to Produce Documents Responsive to Rule 2004 Subpoenas [Dkt. No. 169] and the Protective Order [Dkt. No. 171] both entered on March 10, 2025."  *Id.*, Ex. A (Production Cover Letter).  However, the cover letter also noted that "[a]ll redactions have been made pursuant to the Binetter[s's] invocation of the 5th Amendment Act of Production Privilege, as set forth in the Binetter[s's] Brief Pursuant to March 10, 2025 Order Regarding Fifth Amendment Privilege Production as to Certain Records and Documents [Dkt. No. 180]."  *Id.*  As of the time of this document production, no order had ever issued requiring the production of the bank statements specifically but, instead, the parties were in the process of raising disputes over the scope of Fifth Amendment "act of production" privilege through the Track 2 process described below.

8

**Track 2: The Procedures Order**

For documents withheld from production under Track 1, based on a claimed Fifth Amendment "act of production" privilege, the Procedures Order required the Binetters to submit to the Court a brief "identifying the documents held in their personal capacity in connection with which the Binetter[s] sought to invoke the act-of-production privilege, and as to each document, to explain in general or circumstantial terms why production would be incriminating." Procedures Order ¶ 2. The brief was to be submitted by email, with counsel for the Foreign Representative copied on the transmission. *Id.* Judge Bentley further directed that "sufficient information" be included in the brief to "enable the Court to conduct a factual inquiry to determine the incriminating potential of the documents sought and the act of production against the privilege asserted, and to enable counsel for the Foreign Representative to make the same evaluation." *Id.* ¶ 3. Notably, the Procedures Order did not require the submission of copies of documents themselves—doing so would not have made sense given that the Track 2 process was done on notice to the Foreign Representative and the Binetters were claiming a Fifth Amendment privilege for ***withholding*** a production of documents from the Foreign Representative. The Procedures Order originally contemplated three briefs: the opening brief (ECF No. 180), the Foreign Representative's response in opposition (ECF No. 181), and the Binetters's reply (ECF No. 186).[7] This briefing was meant to encapsulate all outstanding Fifth Amendment disputes subject to the Foreign Representative's Motion to Enforce the 2004 Order that had been left undecided by the resulting Rule 2004 Production Order.

**Further Discovery: Michael Binetter's Deposition & Third-Party Subpoenas**

---

[7] The Binetters also submitted a supplemental statement in support of their opening brief, which added additional categories of documents over which they claimed a privilege assertion. ECF No. 197. The Foreign Representative responded and opposed the validity of the privilege assertion. ECF No. 202.

As the document disputes proceeded, the parties agreed that Michael Binetter would submit to a deposition on July 16, 2025. Ahead of that deposition, counsel for the Foreign Representative requested by letter that the Court be available by telephone during the deposition in the event Fifth Amendment disputes arose. ECF No. 194. Counsel for the Binetters objected, asserting that the request was premature and that if Michael Binetter invoked his privilege, the Foreign Representative should file a motion briefing the issues, consistent with the Track 2 *in camera* briefing process then-underway. *See* ECF No. 196 (Letter Response). On July 14, 2025, the Court entered a memorandum endorsed order, providing that in the event counsel were unable to resolve disputes arising from the deposition, either party could request a conference accompanied by a letter brief, to which the opposing party would have two business days to respond. *See* ECF No. 204. The deposition went forward on July 16, 2025.

During his deposition, Michael Binetter was shown copies of his bank statements, which he had previously produced. No objection to the use of the bank statements was interposed. There was also no attempt to "claw back" copies of the bank statements (nor has there ever been one), such as one might do in the event of an inadvertent production of documents; however, Michael Binetter did refuse to answer any questions about those bank statements during his deposition, asserting Fifth Amendment privilege. Kopp Decl., Ex. C (Transcript).

Shortly after the deposition, on August 4, 2025, both parties filed letter briefs relating to whether Michael Binetter had improperly attempted to invoke Fifth Amendment and whether his repeated refusals to answer questions were substantially interfering with the discovery process. *See* ECF Nos. 207, 208 (Letter Briefs to the Court). The Foreign Representative argued that Michael Binetter's numerous invocations of the Fifth Amendment during his deposition were improper given, among other things, the absence of a reasonable risk of prosecution. ECF No.

10

208. The Binetters disagreed, contending that the questions posed by the Foreign Representative sought to elicit incriminating responses from Michael Binetter because "any question that is either a predicate to, leading up to, or involving a query concerning . . . assets presents an appropriate circumstance" to assert a Fifth Amendment privilege. ECF No. 207. Thus, what became clear was the Binetters's position that all asset-tracing discovery would, in their view, implicate their rights under the Fifth Amendment.

A week later, on August 11, 2025, the Foreign Representative issued a subpoena to JPMorgan for unredacted copies of Michael Binetter's bank statements. *See* Kopp Decl., Ex. D (the "JPMorgan Subpoena"). Following receipt of notice of the JPMorgan Subpoena, the Binetters filed another letter brief pursuant to the Procedures Order, requesting an emergency conference and an immediate stay of discovery. ECF No. 209. Nevertheless, on August 27, 2025, the Court issued a memorandum endorsed order directing the parties to submit a mutually acceptable form of order temporarily barring disclosure of the subpoenaed JPMorgan documents to the Foreign Representative. *See* ECF No. 210 (Memorandum Endorsed Order). That order culminated in an August 28, 2025 order instructing JPMorgan to proceed to gather the records responsive to the subpoena and await a further order of the Court concerning disclosure. *See* ECF No. 212.

Meanwhile, the Foreign Representative attempted to push forward with other third-party discovery and, in September 2025, served a subpoena for documents directly on Nate's Fine Foods seeking eleven categories of information concerning relationships among Nate's Fine Foods, the Binetters, and the New Foreign Debtors. *See* Adv. No. 26-01004, ECF Nos. 1-2 (Motion to Quash Subpoena). The Foreign Representative had identified significant relationships between the Binetters and the prepared food company, Nate's Fine Foods, based in Roseville, California: the New Foreign Debtors had transferred funds to the majority owner of Nate's Fine Foods, Andrew

11

Binetter was a director of the company, and Michael Binetter had served as the company general counsel. *See* Adv. No. 26-01004, ECF No. 1.

The Binetters moved to quash the subpoena in the United States District Court for the Northern District of California, and the Foreign Representative cross-moved to transfer the dispute to this Court. *See* Adv. No. 26-01004, ECF Nos. 1, 2. On January 8, 2026, the Northern District granted the motion to transfer, and on January 20, 2026, this Court opened a new adversary proceeding in connection with the motion to quash. *See* Adv. No. 26-01004, ECF No. 1 (Transfer Order). The matter was thereafter transferred to this Court along with the main case.

## ISSUES TRANSFERRED TO THIS COURT

On February 20, 2026, the Chapter 15 case was transferred to this Court. *See* ECF No. 222 (Notice of Reassignment). Concurrently, the parties submitted status letters explaining the issues outstanding as of the date of the transfer, which included three main categories of disputes:

- ***First***, the adversary proceeding pertaining to the motion to quash the subpoena served on Nate's Fine Foods and transferred to this Court from the United States District Court for the Northern District of California.

- ***Second***, the parties described a "request" (without a motion) to stay or resume written discovery from Andrew Binetter and his wife, Samantha Kelliher, in light of certain medical issues that had arisen since the so-ordered stipulation extending the couple's time to comply with the Rule 2004 Production Order as to the subpoenas served on each of them.

- ***Third***, the parties represented that Michael Binetter had invoked his testimonial and documentary privileges under the Fifth Amendment and identified a number of letters and briefs submitted in connection with that assertion, though the full scope of that dispute was unclear to this Court because, among other things, no motions regarding these issues had been filed since the parties were relying on the Procedures Order and a number of the documents cross-referenced in the letters and listed on the docket of this case as "sealed" in fact were not actually filed under seal or obtainable by this Court at that time.[8]

---

[8] For this reason, the Court subsequently also directed the parties to submit copies of those documents previously identified as having been filed "under seal" and, on March 25, 2026, the Court entered sealing orders with respect to

*See* ECF No. 219 (Foreign Representative Update Letter); *see also* ECF No. 221 (Bineters's Update Letter).

Six days after this matter was transferred, the Court heard argument in the Adversary Proceeding on the motion to quash the Nate's Fine Foods subpoena, including whether the Binetters could invoke their own Fifth Amendment rights to prevent Nate's Fine Foods from complying with the subpoena. Adv. No. 26-1004, ECF No. 8 (Transcript). On the record during the hearing on February 26, 2026, the Court denied the motion to quash insofar as it sought to quash the subpoena outright, including based upon the Binetters's improper attempts to invoke the Fifth Amendment to shield the corporate documents of the corporate entity (Nate's Fine Foods) from production, but granted leave to amend insofar as it sought to modify and narrow the subpoena requests. *See also* Adv. No. 26-1004, ECF No. 9 (Order Denying Motion to Quash). The Court then conducted a status conference in the main proceeding with the parties as to the remaining two outstanding sets of items and instructed the parties to seek any outstanding relief by motion rather than letters raising informal requests for relief. Adv. No. 26-1004, ECF No. 7.

Thereafter, the parties elected to proceed by motion and, on March 4, 2026, the parties submitted a proposed Fifth Amendment briefing schedule providing that the Foreign Representative's Motion to Compel and the Binetter's Motion for a Protective Order would be filed simultaneously on March 23, 2026, that oppositions would likewise be filed simultaneously on April 13, 2026, and that there would be no reply briefs. On March 5, 2026, the Court entered a scheduling order approving that approach, and the parties then filed their motions according to this schedule. As a result, there are now two motions for resolution: ***First***, the Foreign

---

those documents and the motions *sub judice*, so copies of the documents previously presented to the Court have now been filed under seal as their prior filings indicated despite the prior lack of compliance with sealing rules. *See* ECF No. 229 (Order to Show Cause).

Representative's *Motion To Enforce The Rule 2004 Order And To Compel Discovery Over The Binetter Parties' Fifth Amendment Objections* (ECF No. 238, the "Motion to Compel"), which seeks an order (i) compelling the Binetters (Andrew Binetter, Michael Binetter, and Samantha Kelliher) to respond to the Foreign Representative's discovery requests over their Fifth Amendment objections and (ii) directing third-party JPMorgan to comply with the Foreign Representative's August 11 subpoena.[9] **Second**, the *Motion for a Protective Order* (ECF No. 236, the "Motion for a Protective Order") filed on behalf of the Binetters, which seeks an order shielding the Binetters from having to produce certain documents (in full or in unredacted form) based upon their invocation of the Fifth Amendment.[10] However, at the hearing on May 1, 2026, the Binetters clarified their position that the motions *sub judice* were only ripe as to Michael Binetter. Accordingly, this decision addresses only the obligation to produce documents of: (i) JPMorgan with regard to the bank statements sought through the JPMorgan Subpoena (based upon information garnered from Michael Binetter's prior document production), and (ii) Michael Binetter himself with respect to unredacted copies of his bank statements as well as the Australian Court Documents, the latter of which have not been produced in discovery.

---

[9] The Binetters filed an objection to the Motion to Compel asserting, among other things, that the "act of production" privilege shields them from the obligation to produce documents at all, and precludes the Foreign Representative from seeking unredacted copies of Michael Binetter's bank statements, including from third-party JPMorgan. *See* ECF No. 251 (the "Opposition to the Motion to Compel").

[10] The Foreign Representative filed an objection to the Motion for a Protective Order asserting, among other things, that the Binetters lack a reasonable fear of prosecution and, even if they did, the Fifth Amendment does not apply pursuant to the foregone conclusion doctrine. *See* ECF No. 253 (the "Protective Order Opposition"). Additionally, separate and apart from their Motion for a Protective Order, the Binetters have filed one further motion that was not the subject of the briefing approved by the Court: it was a motion to stay discovery for Andrew Binetter and Samantha Kelliher due to health issues. ECF No. 232 (the "Motion to Stay"). There was initially an objection to the Court hearing the Motion to Stay on notice to the Foreign Representative, but the Court overruled that objection and the Foreign Representative filed its opposition to the Motion to Stay on April 15, 2026. The Court addressed and resolved the Motion to Stay at the Hearing, granting a temporary stay of discovery obligations for Andrew Binetter and Samantha Kelliher, and the Court subsequently entered an Order on May 4, 2026, formally resolving the Motion to Stay. Accordingly, the Motion to Stay is not addressed further in this decision. ECF No. 268.

**DISCUSSION**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. This prohibition against self-incrimination applies equally to testimony and to the production of documents, as the very "act of production" may itself constitute compelled testimony in some circumstances. *United States v. Hubbell*, 530 U.S. 27, 36 (2000). Even if the contents of documents are not privileged, the mere act of producing may be privileged if producing the documents furnishes a "link in the chain of evidence needed to prosecute" the witness. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). This extraordinary doctrine is what is known as the "act of production" privilege, and it applies where **production** implicitly communicates **testimonial assertions**, including that (1) the documents exist, (2) the documents are in the person's possession or control, and (3) the documents are authentic, whereby the act of producing them may provide a link in the chain of incrimination. *United States v. Fox*, 721 F.2d 32, 36 (2d Cir. 1983). "Accordingly, the act of producing documents" may be tantamount to "incriminating testimony if the existence or location of the documents is unknown to the government, or the act of producing the documents implicitly authenticates them, *and* in so doing, provides 'a link in the chain of incrimination.'" *In re Schick*, 215 B.R. 4, 9 (Bankr. S.D.N.Y. 1997) (quoting *United States v. Fox*, 721 F.2d 32, 36 (2d Cir. 1983)). For example, where a party must make "extensive use of the contents of his own mind in identifying" responsive documents, the "act of production" itself may be testimonial and therefore contrary to law insofar as the party is effectively being compelled to serve as a witness against himself. *Hubbell*, 530 U.S. at 43 (internal quotation marks omitted).

While the Fifth Amendment appears facially broad, it has eight important limits relevant here. The first three concern **who** may properly invoke the privilege. It protects a person only—

15

not even an agent of that person—from being legally compelled to provide incriminating testimonial information. *Fisher v. United States*, 425 U.S. 391, 397-98 (1976) (Fifth Amendment privilege not violated by enforcement of documentary summons directed at attorneys even though attorneys were agents of clients). Importantly, the "person" covered by the Fifth Amendment is limited to natural persons; corporations or partnerships or other business entities have no such immunity. *Braswell v. United States*, 487 U.S. 99, 104 (1988) (president of corporation could not refuse to produce corporate books and records on behalf of the corporation based upon Fifth Amendment objection). And the Fifth Amendment cannot be asserted derivatively, such as on behalf of a third-party. *Bellis v. United States*, 417 U.S. 85, 88-90 (1974); *In re Standard Financial Management Corp.*, 77 B.R. 324, 327 (Bankr. D. Mass. 1987) (the "Fifth Amendment is a personal right not to testify and does not stretch to documents or items in the hands of others").

In addition to the above, the following limitations inform ***when*** the privilege can apply. It applies only to ***compelled*** acts and not to voluntary statements. *United States v. Butler*, 211 F.3d 826, 830-33 (4th Cir. 2000) (noting that the prior testimony a debtor gave to meet the burden of production in a contempt proceeding in bankruptcy court was admissible against him in a later criminal proceeding, as not all forms of pressure constitute compulsion). *United States v. Doe*, 465 U.S. 605, 612 n.10 (1984) ("If the party asserting the Fifth Amendment privilege has voluntarily compiled the document, no compulsion is present and the contents of the document are not privileged."). Even with respect to compelled acts, the Fifth Amendment does not apply where "the existence and location" of the allegedly inculpatory documents or information "are a foregone conclusion." *Fisher*, 425 U.S. at 411. Additionally, the risk of self-incrimination must be related to a domestic risk of prosecution; it does not apply to a risk of prosecution by a foreign government. *United States v. Balsys*, 524 U.S. 666, 699-700 (1998). Moreover, the possibility of incrimination

16

must be a ***real and substantial*** danger—a remote or speculative possibility of incrimination is insufficient to shield an individual from being compelled to provide information pursuant to a lawful request to do so. *Secs. and Exch. Comm'n v. Pence*, 323 F.R.D. 179, 190 (S.D.N.Y. 2017) (The Fifth Amendment "protects against real dangers, not remote and speculative possibilities." (internal quotation marks and citations omitted)). Crucially, the statute of limitations for charges about which there assertedly is a real and substantial risk of prosecution must not have already expired. *Stogner v. California*, 539 U.S. 607, 620 (2003) (noting that "the Fifth Amendment's privilege against self-incrimination does not apply after the relevant limitations period has expired"). Finally, while there are two distinct motions before the Court, both turn on the same analysis of constitutional rights against self-incrimination and, in both cases, Michael Binetter cannot overcome the limitations of the Fifth Amendment itself.

### JPMorgan Subpoena

With respect to the JPMorgan Subpoena, there are at least five independently dispositive reasons compliance must be compelled over Michael Binetter's assertions of Fifth Amendment privilege. ***First***, JPMorgan is not a natural person and therefore the Fifth Amendment has no direct applicability to JPMorgan. *See Fisher v. United States*, 425 U.S. 391, 397 (1976) (Fifth Amendment rights only apply to natural persons). ***Second***, the Fifth Amendment privilege protects only the person asserting it from compelled self-incrimination and, relevant here, Michael Binetter (not JPMorgan) is the one attempting to invoke the privilege to prevent the bank from producing copies of his bank statements.[11] Michael Binetter's "act of production" privilege is simply not implicated by JPMorgan's independent act of producing its own business records, records made

---

[11] JPMorgan has not even attempted to assert privilege somehow applies to it and, indeed, could not do so on a nonfrivolous basis, including because the bank is a corporate entity and not a natural person. *Braswell v. United States,* 487 U.S. 99, 108-09 (1988).

and kept by the bank in the ordinary course; and he has made no showing that his personal privilege attaches to documents he did not create and over which he exercises no control. ***Third***, even when applied to the individual invoking it (again, not the case with the JPMorgan Subpoena), the Fifth Amendment would not prohibit the production of documents that are already known to exist (under the foregone conclusion doctrine). *Fisher*, 425 U.S. at 411. Here, Michael Binetter already voluntarily produced copies of bank statements from JPMorgan, albeit with redactions—but it was the ***unredacted*** portions of those documents that provided the Foreign Representative with enough information to identify JPMorgan as the account holder. Kopp Decl. ¶¶ 4-5. Thus, it is a foregone conclusion that JPMorgan possesses copies of the documents. *Id.*

***Fourth***, the Binetters were ***never directed*** to produce copies of their bank statements under the Procedures Order (that is, Track 2). The voluntary production of those statements may have been tactical as their counsel represented at the Hearing, but even so, their having voluntarily produced the bank statements earlier overcomes any claim of privilege from production now, as the documents' existence and location became a foregone conclusion by virtue of that disclosure. *Benthos Master Fund, Ltd. v. Etra*, 2023 WL 4350594, at *12 (S.D.N.Y. July 5, 2023) (reasoning that the Fifth Amendment privilege did not apply to monthly bank statements where the asserting party had already voluntarily produced monthly statements for the account in question). The Fifth Amendment "act of production" privilege against self-incrimination is designed to protect a witness from being compelled to concede the existence, custody, or authenticity of incriminating documents—not to shield documents whose existence has already been revealed. *See Fisher*, 425 U.S. at 409-10. Where, as here, the existence and location of the bank statements was disclosed voluntarily, permitting Michael Binetter to now invoke the privilege to resist production of copies of those documents maintained by a third-party would not serve any purpose the Fifth Amendment

18

was designed to protect.  Finally, Michael Binetter's Fifth Amendment arguments with respect to the JPMorgan Subpoena also fail for the same reasons (explained below) that require him to personally produce unredacted bank statements and the Australian Court Documents.[12]

### The November 16 Subpoena to Michael Binetter

Through the November 16 Subpoena, the Foreign Representative sought "[a]ll documents and communications referring, relating to, or concerning any bank account that has been opened or operated in the United States since 1 January 2015," in addition to bank accounts opened by certain entities, amongst other requests.[13]  The Rule 2004 Production Order then compelled compliance with that subpoena, and in response to that order, Michael Binetter now asks this Court to hold that he need not produce unredacted copies of his bank statements and need not produce the Australian Court Documents in any form.  *See* Mot. for a Protective Order at 25.  In the first instance, however, Michael Binetter's assertion of the "act of production" privilege fails for the gating reason that he has failed to establish that the production would cause a reasonable fear of incrimination **in the United States**.  *See United States v. Balsys*, 524 U.S. 666, 674 (1998); *United*

---

[12] Independently, the Binetters's Opposition to the Motion to Compel did not address the Motion to Compel insofar as it seeks JPMorgan's compliance with the JPMorgan Subpoena.  *See generally* Opp'n to Mot. To Compel.  Likewise, the Binetters fail to mention JPMorgan at all in their Motion for a Protective Order.  *See generally* Mot. for a Protective Order.  Having abandoned the issue, the Binetters are deemed to have waived any arguments they may otherwise have had but, in any event, for the reasons already stated, any such attempts would have been meritless. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (issues unaccompanied by some developed argument are deemed waived).

[13]  Those entities included "Suzanne Binetter; B.C.I. Finances Pty Limited; Binqld Finances Pty Limited; E.G.L. Development (Canberra) Pty Limited; Ligon 268 Pty Limited; the Bankstown Eye Trust; Erma Nominees Pty Ltd; the Erwin Binetter Family Trust; Ligon 158 Pty Ltd; the Caringbah Investment Trust; Erbin Finances Pty Ltd; the Erbin Investment Trust; Rawbin Finances Pty Ltd; the Rawbin Investment Trust; Marbin Finances Pty Ltd; the Marbin Investment Trust; Gerobin Finances Pty Ltd;  the Gerobin Investment Trust; Rawson Finances Pty Ltd; Advance Finances Pty Ltd; Civic Finance Pty Ltd;  Ligon 237 Pty Ltd;  the AJB Family Trust;  Jaab Pasta USA LLC; Nate's Fine Foods LLC; Wincia Investments LLC;  the Azzurra Partnership; Shield Holdings Australia Pty Ltd; the Shield Holdings Trust;  Ponite Pty Ltd; Dunba Investments Pty Ltd; Dunmaf Investments Pty Ltd; any entity (whether a corporation, partnership, trust or any other form of legal entity) in which [Michael Binetter] have, or have since 1 January 2015 had, a direct or indirect interest or of which [Michael Binetter] are, or have since 1 January 2015 been, an officer; the persons listed in the schedule" attached to the November 16 Subpoenas. Mirrored subpoenas were also served on Andrew Binetter and Samantha Kelliher.

19

*States v. DeSalvo*, 26 F.3d 1216, 1221 (2d Cir. 1994) (stating that the claimant must be "confronted by substantial and real, and not merely trifling or imaginary, hazards of incrimination") (citations and internal quotations omitted).  The gravamen of Michael Binetter's argument is that the Foreign Representative has repeatedly characterized the Binetters's conduct in criminal terms, including the assertion that: "the Binetter Parties perpetuated a tax avoidance scheme concerning their Australian tax obligations and following certain loans achieved from Israeli banks in the 2012-2013 time frame."  Mot. for a Protective Order at 1.  Many of those characterizations were made in the context of proceedings in the United States Bankruptcy Court.  However, Michael Binetter has not ever identified a crime in the United States that those allegations might support; has not identified any criminal investigation into his activities in the United States; and has not identified any precedent under which someone similarly situated was, in fact, prosecuted in the United States for any crime (or, alternatively, successfully asserted a claim for "act of production" privilege).  The Fifth Amendment unquestionably requires more particularity than the blanket and generalized invocation Michael Binetter has made in this case.  *See Camelot Grp., Ltd. v. W.A. Krueger Co.*, 486 F. Supp. 1221, 1224 (S.D.N.Y. 1980) (providing that the mere assertion that a response would be self-incriminating does not automatically validate a Fifth Amendment privilege claim; the claimant is not exempt from answering on that declaration alone).

Even assuming the allegations made by the Foreign Representative could provide a reasonable basis to fear prosecution, it is not clear how a tax avoidance scheme concerning ***Australian taxes*** and banks ***outside*** the United States could result in criminal prosecution ***inside*** the United States—and for the Fifth Amendment to apply, there must be a risk of prosecution ***in the United States***.  *See Balsys*, 524 U.S. at 674.  (A "witness [has] the right against compelled self-incrimination when reasonably fearing prosecution by the government whose power the Clause

20

limits, but not otherwise.")  Indeed, there is not any evidence that a criminal prosecution has ever been brought even in Australia against any of the Binetters or their companies, though that is the very place where the alleged wrongdoing is said to have principally occurred and one would therefore assume where the risk of prosecution would be most likely.  When coupled with the failure to identify a crime for which Michael Binetter might be inculpated in the United States, the lack of an Australian prosecution (or any related investigation) compels the conclusion that the fear of prosecution at issue here is remote and speculative, rather than real and substantial.

Moreover, on the issue of redactions specifically, Michael Binetter has not identified a single case where selective redactions for Fifth Amendment "act of production" privilege were deemed a permissible exercise of that privilege, which is, after all, a privilege circumscribing the discoverability of documents in the first place.  Indeed, it is hard to imagine under what circumstances such a holding could have issued: under the "act of production" doctrine, a person may invoke their Fifth Amendment right against self-incrimination to refuse compliance with a subpoena wholesale—not because of what those documents contain specifically, but because the ***mere act of producing them*** without regard to their particularized contents could be incriminating and therefore in derogation of an individual's Fifth Amendment right against self-incrimination. *See Benthos Master Fund, Ltd. v. Etra*, 2023 WL 4350594, at \*15 (S.D.N.Y. July 5, 2023) (denying claim of "act of production" privilege where party had already voluntarily produced statements for accounts in question).  Although the bank statements produced in this matter included certain redacted transactions, the other identifying information—including Michael Binetter's identity as the account holder—was left unredacted.  Kopp Decl., Ex. B (Michael Binetter's Bank Statements).  By producing the unredacted portions, the Binetters necessarily treated them as non-privileged.  *See id.*  Because an "act of production" privilege inquiry is concentrated on whether

the subpoenaed party is being asked to communicate an incriminating fact, one that adds to the chain of evidence by virtue of the document production itself, courts tend to focus on whether: (1) the existence and location of the subpoenaed papers are unknown to the requesting party; and (2) whether producing the documents could implicitly authenticate the documents. *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*, 1999 WL 970402, at *6 (S.D.N.Y. 1999). Where, as here, the existence and location of the subpoenaed materials are revealed and the subpoenaed party adds little to the requesting party's information by conceding that he in fact has the documents, then no constitutional rights are touched by enforcement of the subpoena. "The question is not of testimony *but of surrender.*" *Fisher v. United States*, 425 U.S. 391, 411 (1976). That is so because at its origin, the "act of production" privilege is aimed at protecting the responding party from having to disclose the "contents of his own mind" to comply with the request. *United States v. Hubbell*, 530 U.S. 27, 43 (2000). It is "the extortion" of that information from the respondent "that implicates the Self-Incrimination Clause." *Couch v. United States*, 409 U.S. 322, 328 (1973). If the responding party has already produced unredacted portions of a document, it is not the "contents of his mind" he seeks to protect but rather the contents of a page **already known to exist** by the requesting party. *See Hubbell*, 530 U.S. at 43. The "act of production" privilege operates as an all-or-nothing shield against producing documents in the first place, not as a scalpel to excise selective contents from documents otherwise deemed discoverable. That is beyond the limits of the Fifth Amendment "act of production" privilege.

The Australian Court Documents present an even clearer case for rejection of the privilege claim. They consist of the April 10 Australian Affidavit, the Australian Asset Statements, the Australian Transcripts of Australian court proceedings, and the Other Australian Affidavits of

22

third-party witnesses to the Australian legal proceedings.[14]  While Michael Binetter need not reveal the contents of the documents he seeks to protect, he must persuade the Court based on his general descriptions of those documents that producing them implicates a reasonable fear of prosecution in the United States.  *Hoffman v. United States*, 341 U.S. 479, 486 (1951) (where there is no readily apparent risk of prosecution but merely a theoretical one, the witness bears the burden of establishing that he has "reasonable cause" that the information he would provide would fuel a criminal prosecution in the United States).  He has not done so here.

Michael Binetter contends that the April 10 Australian Affidavit, which was submitted by a third party to an Australian court is "obviously privileged"; that the Australian Asset Statements and Other Australian Affidavits "are privileged under the Foreign Representative's theories of financial impropriety"; and that the Australian Transcripts trigger the Fifth Amendment "insofar as these claims may possibly be considered inculpatory."  Mot. for a Protective Order at 22-23.  These conclusory characterizations do not identify any specific reason for which Michael Binetter faces a real and substantial risk of prosecution in the United States, point to any criminal investigation, or cite any precedent in which a similarly situated person was prosecuted.  That is precisely the kind of blanket, generalized invocation the Fifth Amendment does not permit.  *See Camelot Grp., Ltd. v. W.A. Krueger Co.*, 486 F. Supp. 1221, 1224 (S.D.N.Y. 1980).

In fact, the Australian Court Documents are even more attenuated from a reasonable fear of United States prosecution than the bank statements, for several independent reasons.  ***First***, some of the Australian Court Documents—including the April 10 Australian Affidavit—are more than a decade old, which would appear to create a likelihood that any criminal acts described therein beyond the reach of the applicable federal fraud statutes of limitations.  *See*

---

[14] *See supra* note 5 for a full list of the Australian Court Documents based on the parties' submissions.

23

18 U.S.C. § 3282 (five-year general limitations period); 18 U.S.C. § 3293 (ten years for fraud affecting financial institutions).   Where the limitations period has expired, there can be no reasonable fear of prosecution, and the Fifth Amendment privilege does not attach.  *Secs. and Exch. Comm'n v. Pence*, 323 F.R.D. 179, 190 (S.D.N.Y. 2017).   ***Second***, several of the documents—including the third-party affidavits—were prepared by others (not any of the Binetters) and submitted to Australian courts.  Michael Binetter has not explained how producing documents he did not author, submitted in foreign proceedings, would tend to incriminate him ***in the United States***.  *United States v. Nobles*, 422 U.S. 225, 234 (1975) (noting that the privilege does not generally apply to documents prepared by third parties).

***Third***, and perhaps most tellingly, the underlying conduct never appears to have given rise to a criminal prosecution (or even an investigation) in Australia—the very jurisdiction where it principally occurred and where prosecution would be most likely.  If Australian authorities with direct knowledge of these proceedings and their contents declined to prosecute, the notion that production of these same documents in a United States bankruptcy proceeding would expose Michael Binetter to criminal liability here is not a real and substantial fear but a speculative one. *Benthos Master Fund, Ltd.*, 2023 WL 4350594, at *7 (explaining that where incriminating facts have already been freely provided, the Fifth Amendment privilege cannot be invoked to avoid disclosing related details, the inquiry becomes whether the requested testimony would represent a reasonable danger of ***further incrimination*** in light of all of the circumstances).  Moreover, the record already contains Australian court decisions, *see, e.g.*, ECF Nos. 2, 143, 163, one of which spans over 1,030 paragraphs and chronicles in extensive detail the very tax scheme that Michael Binetter now claims he fears will expose him to prosecution in the United States.  Those filings have been a matter of public record in the United States for nearly a decade, and nothing has come

of it.  The Australian Court Documents Michael Binetter seeks to shield from production make up portions of the underlying evidentiary record on which those published decisions were based—the same facts, the same transactions, the same alleged conduct, now dressed up as privileged. It is difficult to understand how producing those underlying materials could meaningfully add to the chain of incrimination when the conclusions drawn from them have been publicly available for years without consequence.  ***Fourth and finally***, the Foreign Representative is already a participant in the Australian proceedings and is therefore largely aware of these documents.  It is difficult to discern how compelling Michael Binetter to produce records the Foreign Representative already knows exist could tip the needle toward any prospective prosecution in the United States.  *Fisher*, 425 U.S. at 411.  For all of the foregoing reasons, Michael Binetter has failed to sustain his burden of establishing that the Fifth Amendment "act of production" privilege applies to unredacted copies of his bank statements or to the Australian Court Documents and he must produce both.

### CONCLUSION

For the reasons set forth above, the Motion to Compel is **GRANTED** as to Michael Binetter and the Motion for a Protective Order is **DENIED** as to Michael Binetter.  A separate order consistent with this ruling is being issued concurrently herewith.

Date: May 26, 2026
New York, New York

/s/ *Shireen A. Barday*
**HONORABLE SHIREEN A. BARDAY**
**UNITED STATES BANKRUPTCY JUDGE**

25